## Grier Estate.

518

Argued November 28, 1960.   Before JONES, C. J.,
BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

reargument refused May 31, 1961.

*Paul Maloney*, with him *Philip A. Bregy, Eric A. McCouch, Ralph C. Busser, Jr., Joseph N. DuBarry, IV, William C. Ferguson, Jr., H. Clayton Louderback, James A. Matthews, Jr., Samuel W. Morris, A. J. Drexel Paul, Jr., Frank O. Schilpp, William P. Thorn, Seth W. Watson, Jr., Thomas S. Weary, Albert C. Weymann, Jr.,* and *Helen M. Wilcox*, for appellants.

*B. I. deYoung*, for appellant.

*John Harper* and *William H. S. Wells*, with them *John R. Suria*, and *Saul, Ewing, Remick & Saul*, for appellees.

OPINION BY MR. CHIEF JUSTICE JONES, May 2, 1961:

The present appeals question the interpretation placed by the court below upon the will of Jay R. Grier who died resident in Philadelphia on June 13, 1958, at the age of 87. Mr. Grier had never married and left to survive him as his heirs at law and next of kin three cousins, two on his maternal side and one paternal. For 67 years he had been a member of the bar of Philadelphia County and, in the practice of his profession, had acquired a reputation as a specialist in probate and orphans' court matters. His will is typewritten, the typing evidently being his own work. The validity of the will is undisputed. The sole question of law involved is as to the quantum of the decedent's estate made subject to his testamentary dispositions.

By Item One of the will, the testator *ordered* and *directed* his executors to sell his personal property and, "after all debts, inheritance taxes and the like have been fully paid, to distribute the residue to and among the following named persons and/or corporations, as hereinafter bequeathed, that is to say:" Then follow the names of four individuals (including the two maternal cousins) and twenty-three eleemosynary corpo-

rations with a specified sum of money allocated to each, "free of all taxes and absolutely." The sums so specified aggregate $125,450, or roughly 20% of the decedent's net estate available for distribution *after payment of all debts and taxes.*

Following the last of these monetary allocations, there is a blank space in the will, about two inches deep and the width of the page; and, immediately following the blank space is Item 2, which is the concluding dispositive provision of the will.

By Item 2, the testator authorized and directed his executors to sell his residence property in Germantown and "to distribute the proceeds to and among the legatees as hereinebefore [sic] named." This property was the decedent's only realty and had a value of approximately $6,000.

The testator nominated and appointed two friends as executors of the will and signed it on May 7, 1955. Upon the death subsequently of one of the named executors, the testator on March 18, 1956, wrote in longhand on the bottom of the will, and signed, a codicil appointing a substitute co-executor for the one who had died.

It is agreed on all sides that at least the last named beneficiary and monetary allocation under Item One was typed in a portion of the blank space some time after the testator had typewritten and executed the rest of the will. This is evident from the fact that the type in the last specification is lighter in shade than the preceding typing and the left-hand margin is indented by the width of three type spaces beyond the margin established when the will was originally written. There is also a deviation of two type spaces in the marginal indentation of the three named beneficiaries immediately preceding the last one. It is possible, therefore, that those three specifications were also typed in the blank space subsequent to the testator's

execution of the will as originally written. But, however that may be, no one questions that the last beneficiary's name and monetary allocation was typed in the blank space some time subsequent to the typing of the original will.

The auditing judge concluded that the decedent's testamentary intent, as evidenced by the *written* words of his will, was that the *whole* of his net estate "after all debts, inheritance taxes and the like have been fully paid" should be distributed "to and among" his testamentarily named beneficiaries in the proportions that their respectively specified monetary interests in the decedent's estate bear to the total sum of all such designated interests. On exceptions to the decree nisi entered by the auditing judge, the court en banc reversed and substituted the final decree now here on appeal. This decree, instead of awarding the "residue" of the decedent's estate after payment of "all debts, inheritance taxes and the like" to the testamentarily named beneficiaries, restricts the distribution to them to the specified sums of the monetary allocations. The result is an intestacy as to four-fifths of the decedent's estate available for distribution and, this, the court awarded to the testator's three cousins. The maternal cousins, as already stated, are among the named beneficiaries in the will. But, the testator bequeathed nothing to his paternal cousin whom he had neither seen nor heard of for years, according to the evidence adduced at the audit. The testator's deliberate intent to exclude that cousin from sharing in the distribution of his estate could hardly be more evident.

The primary testamentary intent, as plainly expressed in Item One of the will, is that "any and all" of the decedent's personal property should be sold and "after all debts, inheritance taxes and the like have been fully paid" the "residue" (i.e., what remained after the mandated payments) should be distributed

"to and among the following named persons and/or corporations." The effect of what the testator thus did was to constitute all of his thereinafter named beneficiaries legatees of his *residuary estate as he had defined it in Item One.* Such was his unmistakable animus testandi which, rightly, must be kept uppermost in mind if the will is to be interpreted as the law contemplates, viz., according to the intent to be gathered from the *plain words* found within its four corners. Authority for that fundamental rule of construction hardly needs citation.

The sums specified in the pecuniary allocations were merely for the purpose of spelling out the respective proportionate interests of the named beneficiaries in the "residue" which the testator set apart for distribution "to and among" them. How else could the executors distribute the testamentary defined "residue" of the converted personalty "to and among" the beneficiaries named? Only by so construing the monetary provisions of the will can effect be given to the decedent's *manifest* intent to die *testate* with respect to the whole of his estate available for distribution. "One who writes a will is presumed to intend to dispose of all his estate and not to die intestate as to any portion thereof: Provident Trust Co. of Philadelphia v. Scott, 335 Pa. 231, 6 A. 2d 814; Duffy's Estate, 313 Pa. 101, 169 A. 142; Appeal of Ferry, 102 Pa. 207; Miller's Appeal, 113 Pa. 459, 6 A. 715. If possible to do so, a will must be construed to avoid an intestacy; Rapson's Estate, 318 Pa. 587, 179 A. 436; Boland v. Miller, 100 Pa. 47." *Carmany Estate,* 357 Pa. 296, 299, 53 A. 2d 731. In the instant case, the court below made no apparent attempt to construe the decedent's will so as to render him testate, if possible, as to the whole of his estate for distribution.

Use of the allocated sums, instead of percentages or fractions, to determine the legatees' proportionate in-

terests in the "residue" for distribution was designed to accommodate the testator's possibly adding one or more beneficiaries in the blank space, which he actually did later in at least one instance, if not three more. By a monetary specification of a beneficiary's interest in the "residue", the addition of another legatee would at once automatically reflect itself in a pro tanto reduction in the respective proportionate interests of all other legatees. On the other hand, if percentages or fractions were used to designate the beneficiaries' respective interests in the "residue" for distribution, every time the testator wanted to add a beneficiary he would have to rewrite his will because of the necessity of making a change in all of the other percentages or fractions. Otherwise, his depositions would exceed the whole.

The testator could not have intended that the monetary allocations specified for his named beneficiaries should be the limit of their participation in the distribution of his personal estate, all of which, after payment of all debts and taxes, he had ordered and directed his executors to distribute "to and among" them. He undoubtedly knew that the total of his specified monetary allocations to beneficiaries was but a portion of the estate that would likely be available ultimately for distribution; and he must also have realized that, without knowledge of what his debts and the inheritance and estate taxes would amount to at his death or what the value of his securities and other personal property would be when converted after his death, he could not apportion the whole of his net estate among his beneficiaries by bequeathing to them fixed lump sums.

The design of the decedent's will, that the residue of his personal estate, after payment of all debts and taxes, should be distributed to his named beneficiaries in the proportions relatively determined by the mone-

tary allocations made by the will, is further confirmed by Item 2, wherein he directed his executors to make a sale of his residence property in Germantown and "to distribute the proceeds to and among the legatees as hereinebefore [sic]. named." He had differentiated substantially in the monetary sums allocated by his will to the various named beneficiaries. How else could he have intended such distribution of the proceeds of the realty to be made than in the proportions in which the "residue" of his personalty was to be distributed?

This case bears a certain analogy to cases of lapsed or void legacies. Any lapsed or void legacy, bequeathed to a person not within the statutorily specified consanguineous relationship, falls into the residue and passes to the residuary legatees "in proportion to their respective shares or interests in the residue." See Wills Act of April 24, 1947, P. L. 89, §14(10), 20 PS §180.14(10). This provision of the Wills Act of 1947 is not presently applicable, but it would have been had one of the individual beneficiaries died or one or more of the corporate beneficiaries ceased to operate and dissolved prior to the testator's death. The situation obtaining in the instant case is not different in principle. Here, there was a monetarily unallocated portion of the "residue" of the decedent's estate for distribution, as defined by Item One of his will. Only by dividing such residual balance among the named beneficiaries in proportion to their respective interests, as fixed by the decedent's own testamentary apportionment, could his executors carry out the plainly expressed mandate of his will. The monetarily unallocated balance of the "residue" was a necessary incident of the testator's scheme for the distribution of his entire net estate to his beneficiaries.

Actually, the court below did not *interpret* the will; it merely reconstructed it. By placing one unwarranted

inference upon another, the lower court brought about a result which is a complete negation of the testator's pervading intent, that the *residue* of his converted personal property, after payment of all debts and taxes, should be distributed *to and among* his named beneficiaries. The course pursued by the court below to reach its result was, first, to impute to the testator, who was concededly well versed in probate nomenclature, a corrupted use of the word "residue" in the dispositive provision of Item One, and then to infer from this assumption that the testator did not mean the word "residue" to embrace the entire balance of his converted personalty after payment of all debts and taxes as he provided in Item One. In so doing, the court ignored the well-established rule that "In construing a will technical words must ordinarily be given their legal effect since it must be presumed that they were intentionally and intelligently employed: [citing cases]." *Baldwin Estate,* 377 Pa. 268, 273, 105 A. 2d 52. This rule of construction is peculiarly applicable where the technical words employed are used by one "learned in probate law," as the court below concedes this testator to have been.

With the word "residue" thus denied its intended meaning, the court below derived its ultimate conclusion by assuming that the specified monetary allocations to the named beneficiaries constituted fixed pecuniary legacies which would have to be deducted from the balance for distribution before a residue would be determinable. This assumption plainly begged the question for decision. The court's problem was to interpret the will so as to give effect to, and harmonize, all of its parts in order to effectuate, if possible, the testator's intent. As lately recognized in *O'Brien Estate,* 381 Pa. 322, 325-326, 112 A. 2d 178, "It is hornbook law that a testator's intention must be ascertained from a consideration of the entire will; and that

every clause and every word of a will must be construed together and given effect if that is reasonably possible; and that a clause will not be considered inconsistent or repugnant to other provisions of the will if it can reasonably be construed in a manner consistent with the other provisions of the will: [citing cases]."

Having thus concluded that there existed a different residue than what had been disposed of by the testator's order and direction to his executors in Item One, the court below then drew the further unsupportable inference that the purpose of the blank space was to enable the testator to type therein later an additional residuary clause, which he never did. There is nothing written or intrinsic in the will to justify such an inference. The only permissible inference to be drawn from the will, itself, as to the purpose of the blank space, is that the testator could later type therein the names of additional beneficiaries with monetary allocations to each, just as he unquestionably did in at least one instance. That is the only fact from which any inference as to the purpose of the blank space can justifiably be drawn. All else is mere guess or speculation. Inferring without basis that "This aged man either wholly forgot to complete his will [by filling in the blank space with a further residuary clause] or died before he made up his mind with finality", the court en banc gave controlling effect to the blank space, where obviously *nothing* is expressed, rather than to what the written words of the will plainly import, viz., that what remained of his estate's converted personality "after all debts, inheritance taxes and the like have been fully paid", should be distributed "to and among" his named beneficiaries.

The opinion for the court below further argues that, since the will provides in the case of each of the monetary allocations that it should be "free of taxes and absolutely", the only funds with which the

inheritance and estate taxes could be paid would be the portion of the decedent's estate remaining "after the payments of debts, taxes and the other pecuniary legacies". This argument completely overlooks the provision in Item One of the will that "all debts, inheritance taxes and the like" were first to be paid out of the funds realized from the sale of the decedent's personal property. The reason for the specific inclusion of a tax free provision in the case of each of the monetary allocations is not difficult to perceive. It was included in order to preserve intact the proportional amounts of the allocated interests in the decedent's estate. Otherwise, the proportions might have been changed by possible apportionment of estate taxes or by relief of the charities from the Pennsylvania Transfer Inheritance Tax liability which actually did occur a little later. At the time of the execution of the will on May 7, 1955, charities were not so exempt; however, they did become exempt by virtue of the Act of May 28, 1956, P.L. (1955) 1757, which took effect on June 1, 1957. But, the bequests to the individual beneficiaries have never been so exempted. If the testator had not attached the tax free provision to each of the monetary allocations, by the time of his death the bequests to the individuals would have been chargeable with their pro rata share of such taxes and their interests in the "residue" proportionate to the charities' interests would have been lessened by so much. The provisions in the will securing to each of the beneficiaries complete freedom from liability for inheritance or estate taxes preserved to all alike their proportional interests in the "residue" for distribution on the basis of the monetary allocations as fixed by the testator in his will.

The decree of the court below is reversed and the record remanded for the entry of a decree in accordance with this opinion; the costs to be borne by the estate.

DISSENTING OPINION BY MR. JUSTICE BELL:

The majority has rewritten testator's will. Testator directed his executors after the payment of debts, etc., to distribute the residue to and among the following named persons and/or corporations as hereinafter bequeathed: "To *Martha G. Michael,* the sum of Two thousand dollars, ($2,000.00) free of all taxes, absolutely. To *Laura Sand,* the sum of One hundred dollars ($100) free of all taxes; To *The First Presbyterian Church in Germantown,* its successors and assigns the sum of Ten thousand dollars ($10,000.00) free of all taxes, absolutely." These are three examples of twenty similar gifts. To say that this experienced probate lawyer did not know the difference between (on the one hand) twenty-three pecuniary gifts each in a specified *dollar amount,* and each followed by the words "free of all taxes", with (on the other hand) a gift to each legatee of a *percentage* of his residuary estate is so far-fetched as in my judgment to be incomprehensible. The majority (1) ignores or renders meaningless the clause at the end of each pecuniary gift "free of all taxes" and makes the legatee pay his share of all taxes, and (2) then changes the words Two thousand dollars ($2000) etc., to "a percentage"—words as different as day and night. A Court certainly should not rewrite a testator's will when the dispositive language is so clear, and the Court's "rewrite" must replace day with night.

The blank space in the will was obviously left open by the testator for a later insertion by him of additional legacies, which the majority admit testator actually made. After the will was written testator concededly added a legacy in the blank space: "To *Miss Laura Sand,* of 5321 Wayne Avenue, Germantown, Philadelphia, the sum of *Two hundred and fifty dollars* ($250), free of taxes and absolutely in appreciation of her many kind acts from time to time."

Furthermore, we note that the majority's reliance upon the presumption that a testator intends to dispose of his entire estate and not to die intestate is ineffective when met as here with the equally important and "legally-equal" presumption that an heir is not to be disinherited except by plain words or necessary implications: *Bigony Estate,* 397 Pa. 102, 152 A. 2d 901. Even more important the presumption relied upon by the majority is overcome completely by the testator's clear language of a specific pecuniary *dollar gift* which cannot be distorted into a "percentage" gift. Even a layman, let alone an experienced probate lawyer, knows that there is a tremendous difference between a legacy of $10,000 or $5,000 or $100 and a *percentage* of 1/10th of 1%, 10%, 5%, etc.

I would affirm the decree on the very able opinion of President Judge KLEIN.

—————

DISSENTING OPINION BY MR. JUSTICE BOK:

I dissent because I feel that the Majority has unwarrantedly construed the will and presumed the testator's meaning: time and again it announces what was his primary intention, or purpose, or design, calling them plain or manifest or undoubted or unmistakable, as things that he undoubtedly knew or must have realized, and then it rewrites the will in order to substitute percentages for dollar marks.

Such method of construction is proper when there is ambiguity in the will, and if the words within its four corners do not dissipate uncertainty, extrinsic circumstances may be resorted to, even by parole evidence. But where there is no ambiguity, rules of construction have no place, and the testator's intention must primarily appear from the face of the will: *Battles Estate,* 379 Pa. 140 (1954), 108 A. 2d 688; *Beisgen Estate,* 387

Pa. 425 (1956), 128 A. 2d 52. There is no ambiguity here.

I think it clear that this testator, who concededly was eighty-seven at his death and not only had practised law in Philadelphia for sixty-seven years but was a specialist in probate work, left a clear and unambiguous will. There is nothing uncertain about a direction to sell all personal property "and after all debts, inheritance taxes and the like have been fully paid, to distribute the residue to and among the following named persons and/or corporations", naming four persons, one twice, and twenty-three charitable corporations. There is nothing uncertain about his putting a definite bequest in dollars after each name, plus the legend: "free of all taxes, and absolutely."

In the only remaining item the testator told his executors to sell his one piece of real estate, which was worth about $6,000, and "to distribute the proceeds to and among the legatees as hereinebefore [sic] named", and this must mean in equal shares to those specific legatees (not residuary legatees) named in Item 1.

This was the whole will. Looked at flat as a plate, it needs no construction or inferential interpretation. With a will that leaves part undisposed of, the law is that the remnant is an intestacy and passes to the next of kin under the Intestate Act of April 24, 1947, P.L. 80, 20 P.S. §1.1 et seq.

Why should we speculate, as the Majority does, that the testator meant something else when this is what he did, or why he left out the cousin whom he had not seen for years? The Majority says that "the testator's . . . intent to exclude that cousin . . . could hardly be more evident." I see nothing evident about it: there may be a handful of reasons to explain the cousin's absence. Why should we guess at intention when the will, as a fact, is clear and no word within it needs

interpretation? The testator did what he did, and we must judge the paper fact exactly as it lies.

The clearest tell-tale that the will has no residue is the legend that each bequest shall be free of tax. A lawyer expert in probate law must know that taxes are to be paid out of something, and that the residue. The twenty-eight specific legatees are effectively separated by the legend from any residuary provision; the tax is passed along to someone not named as residuary legatee, and the specific bequests are not to be reduced by their proportionate shares of what has already been paid in taxes. They are as separate from the residue as if they had appeared in an item by themselves. The testator has made twenty-eight specific bequests and no residual disposition whatever beyond a direction to pay the tax. Had he added one name to take all that was left and added the same legend, all twenty-nine legatees would have had to share the tax; in such case the tax-free legend would mean nothing. Had he added one name without the tax-free legend, that person would have born the entire tax and taken the entire balance. Had Item 1 contained only two names, each to receive $100, it is unthinkable that they would take the whole residue of about $600,000.

Why speculate and interpret such a situation? The law has created its own compromise of myriad shadings of such facts by making the undisposed of remnant an intestacy. After all, the testator let his will sit and even republished it to include a new executor.

The Majority gives weight to the words "to and among" as indicating the recognition of a named group. But it cites no authority for any artful meaning of the words. Actually, they aren't relevant and don't affect the case, since there is no effective residue to which the words can apply, and the phrase in question therefore applies to nothing. The testator had not begun to make his actual residual dispositions. Why is it odd

or forced that he should list everyone he could think of as a special donee and be satisfied that the rest, minus the tax, should go to his kin? It may be asked why he included two of his three cousins among the twenty-eight legatees, and the answer is of course that no one knows, but that it is as convenient to assume that the testator put them there until he had completed his thought as it is to assume that he wanted them to share but the third cousin not.

There is a point beyond which, to achieve what only seems to be a good result, we should not stray about in the fabulous area of a mind's intention. Nor should we correct the testator's errors.

As for the presumption against intestacy and in favor of disposing of all that one has, it is met by the legally equal test that an heir is not to be disinherited except by clear language. Moreover, a presumption is of use only when there is need for it. It fills a gap, as Nature does a vacuum. This testator may well have intended to leave twenty-eight specific bequests and let the intestate law dispose of the rest. This is an obvious testamentary scheme for an expert lawyer and comes nearer to being his obvious intention, since nothing need be done by way of interpretation to reach it, than does another solution that requires artificial rules.

Mr. Justice BELL joins in this dissent.